1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10
11

FLORENCIO A. ANSELMO,

Petitioner,

12

v.

13
14

JOSIE GASTELO, Warden,

15

Respondent.

16

Case No.  18-01446 BLF (PR)

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS;
DENYING CERTIFICATE OF
APPEALABILITY; DIRECTIONS
TO CLERK**

17        Petitioner has filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C.

18 § 2254 challenging his 2016 criminal judgment.  Dkt. No. 1 ("Petition").  Respondent filed

19 an answer on the merits.  Dkt. No. 11 ("Answer").  Petitioner did not file a traverse.  *See*

20 *generally*, Dkt.  For the reasons set forth below, the petition is **DENIED**.

21                                        **I.  BACKGROUND**

22        A jury convicted Petitioner of first degree murder by lying in wait, with the special

23 circumstance of lying in wait and personally using a deadly weapon.  *See* Cal. Penal Code

24 §§187(a),190.2(a)(15), 12022(b)(1).  On July 28, 2016, the trial court sentenced Petitioner

25 to life without the possibility of parole, running consecutively from a one-year determinate

26 term for the personal-use enhancement.  *See* Ans. at 2.

27
28

On October 12, 2017, the California Court of Appeal ("state appellate court") affirmed the judgment. *Id*. at 1; *see also People v. Anselmo*, No. H043817, 2017 WL 4546264, at *1–3 (Cal. Ct. App. Oct. 12, 2017) (unpublished). On April 26, 2017, the California Supreme Court summarily denied a petition for review. *Id.*

When the last state court to adjudicate a federal constitutional claim on the merits does not provide an explanation for the denial, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Wilson v. Sellers*, ––– U.S. –––, 138 S.Ct. 1188, 1192 (2018). "It should then presume that the unexplained decision adopted the same reasoning." *Id.* Here, the California Supreme Court did not provide an explanation for its denial of the petition for review. *See* Ans., Ex. H. Petitioner did not argue that the California Supreme Court relied on different grounds than the state appellate court. *See generally,* Pet. Accordingly, this Court will "look through" the California Supreme Court's decision to the state appellate court's decision. *See Skidmore v. Lizarraga*, No. 14-CV-04222-BLF, 2019 WL 1245150, at *7 (N.D. Cal. Mar. 18, 2019) (applying *Wilson*).

Petitioner filed the instant habeas petition on March 6, 2018. *See* Dkt. No. 1 ("Petition"). The Petition recites Petitioner's habeas claims in broad terms. *See generally, id.* As supporting argument, the Petition attaches Petitioner's brief to the state appellate court and the state appellate court's order denying Petitioner's appeal. *See generally*, Pet. at Exs. A-B ("Petition Exhibits").

## II. STATEMENT OF FACTS

The following background facts are from the opinion of the state appellate court on direct appeal:

> Defendant and the victim, Maria Ceja, had been in a relationship on and off for about a year before she was killed on July 5, 2014. For three or four months during that period he lived with Ceja, three of her children, and two young grandchildren. He was not living with Ceja on July 4, but he had frequent contact with her by voice mail and text messages, and about a week or two before

that day he came to her home with flowers. About two days before July 4 he helped Ceja fold newspapers for her job delivering them.

Defendant and Ceja broke up about every other month, and Ceja had other boyfriends besides defendant. Ceja liked to go dancing, which caused the two to argue. Defendant did not like Ceja to go out, to drink, or to talk to anybody else. On one occasion she showed her son, Jesus, a bite mark in her lip, which he believed had been caused by defendant. Jesus never heard defendant threaten his mother, but he was concerned when he heard a couple of voice-mail messages to her from defendant and saw a photo he had sent her, which showed defendant holding a knife to his throat. Ceja appeared to be upset and worried by the photo.

Jasmin, an adult daughter who lived with her two children in Ceja's apartment, had also seen Ceja worried about her safety. About a month before the killing, defendant had left a voice mail for Ceja saying that "'[i]f you're not going to be for me, you're not going to be for anyone.'" Ceja told Jasmin that if anything happened to her, Jasmin would know who it was, namely defendant. About a week before she was killed, Ceja showed Jasmin a picture sent by defendant, showing him with a knife on his neck.

On July 4, 2014, Ceja went to Mariano's, a nightclub with two bars inside. At 9:01 p.m., defendant left her a voice mail telling her how much he loved her and saying that he was going to Mariano's to see if she was there.

A surveillance video at the club showed defendant arriving at 9:25 p.m. Ceja was sitting inside with a group of friends. Video footage showed defendant approaching Ceja and making contact with her at their table, followed by some discussion or argument; one of the friends pushed defendant's arm off and walked away. Defendant then grabbed Ceja's hand and led her to the dance floor. Over the next 40 minutes they danced several times.

Loriann Rodrigues, one of Ceja's friends, had moved Ceja earlier because defendant "kept coming up and trying to get her to dance, and he kept grabbing at her arm." Ceja kept telling defendant no, and at one point Rodrigues stood up and confronted defendant. Shortly thereafter Rodrigues called the security guard over to take defendant away from the table. Defendant refused to move away; he grabbed his cowboy hat and threw it on the ground. Security escorted defendant out of the club. After that, defendant was seen on video surveillance outside, pacing back and forth, trying to make phone calls, and occasionally leaning up against Ceja's car.

While defendant was outside, Esperanza Reyes, another of Ceja's friends at the club, was in the restroom with Ceja when

Ceja said, "Listen. He's threatening me." She played a voice message for Reyes on her phone. Reyes heard an angry male voice yelling, " 'You will see that this time I'm going to kill you. I already told you before I am going to kill you."

Ceja left the club just before 11:19 p.m. Phone records from Ceja's cell phone between 10:20 and 11:18 p.m. listed 16 calls made from defendant's phone to Ceja's, and another six after that, ending at 12:10 a.m. the next day. At 10:24 p.m. he left a voice mail in which he cried, telling her it was her fault and saying, "[Y]ou're going to pay for this, you don't know it, but you are." In another voice mail at 10:32 p.m. he repeatedly said, "Why did you do this to me?" and asked twice when she would be leaving. At 10:37 p.m. there was only crying, followed by "I'm going to wait for you" and inaudible speech. At 11:00 p.m. there was crying; then he said, "It's your fault. It's your fault that they put me outside like a garbage can." After more crying he called her a "puta" and told her she was "going to pay ... if not now, tomorrow."

When Ceja left in her car, defendant walked to a Shell station across the street and got into a cab parked there. At Ceja's apartment [FN 3] her 12-year-old daughter, Y., was watching a movie when she heard a scream outside. Looking out the window, she saw her mother's car, which was still running, and ran toward it. Defendant was leaning into the driver's side, but when he saw Y., he tried to close the door. Ceja's foot was blocking the door, so defendant grabbed his hat from the roof of the car and ran away. Y. went to her mother and saw blood on her chest. She yelled to her brother, Jesus, to call 911.

> [FN 3: Ceja's apartment was between four and seven miles from Mariano's.]

Jesus, then 17, spoke to the 911 operator as he tried to keep his mother awake. Her chest was bleeding and she struggled to breathe. When the first officer on the scene, Derek Gibson, arrived at 12:15 a.m., he saw a stab wound in the center of Ceja's chest. She was unconscious and her breathing was shallow. The parties later stipulated that Ceja died from two stab wounds to the chest.

Detective Dale Fors located Ceja's cell phone inside the car. He sent a text message to defendant's phone, saying, "Why did you do this to me?" At about 4:00 p.m. on July 5, defendant was found at the home of a friend. He was intoxicated, so was taken to the police station, yelling obscenities in Spanish. Defendant was kept in a holding cell and observed for about five hours until he appeared sober and alert. During that period defendant asked Officer Anthony Garcia if he would allow his lady to see another guy; when he received no response, he added, "That's why I'm here." Defendant continued yelling insults and threats to kill Officer Garcia.

Detective Rodolfo Roman questioned defendant at the police station after reading defendant his *Miranda* rights. The entire interview was conducted in Spanish. Afterward officers took defendant to the place where he had told them the weapon was located. There inside a tree was a black cowboy hat, orange boots, and a camouflage folding knife. On the boots and knife was blood, which was stipulated to be Ceja's. After returning to the station, detectives conducted another interview. Both interviews were video-recorded and played for the jurors, who were also given transcripts with English translations. During the first interview, defendant admitted that he stabbed Ceja out of anger at being thrown out of the bar; he "wanted to get even with her." After waiting for her outside the bar, he told the detectives, he took a taxi to her apartment, hid inside her van, and confronted her when she arrived.

Defendant was charged by information with one count of first degree murder committed willfully, deliberately, and with premeditation. (§ 187, subd. (a)). The information further alleged that defendant had carried out the murder by lying in wait, within the meaning of section 190.2, subdivision (a)(15). An additional enhancement allegation stated that defendant had personally used a deadly weapon, a knife, within the meaning of section 12022, subdivision (b)(1).

Trial began on June 8, 2016. After testimony by prosecution witnesses, the defense presented numerous text messages and voice mails from defendant in the days preceding the stabbing, in which he declared his love for Ceja and asked her for forgiveness. The jury also heard about defendant's bringing flowers to Ceja and helping her fold newspapers shortly before that night.

On June 17, the jury found defendant guilty as charged and found the allegations of lying in wait and personal use of a weapon to be true. On July 28, 2016, the trial court denied defendant's subsequent motion to set aside the verdict or, alternatively, grant a new trial. It then sentenced defendant to life without the possibility of parole. Defendant's appeal is timely.

*Anselmo*, 2017 WL 4546264, at *1–3.

## III. DISCUSSION

### A. Legal Standard

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.

§ 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Id.* at 412; *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir.), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. A federal habeas court

making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

**B.    Claims and Analyses**

Petitioner raises the following six claims in this federal habeas petition:

(1) that the trial court erred in the wording of instruction CALCRIM No. 3428;

(2) that the trial court erred by giving the jury instructions CALCRIM Nos. 521 and 728;

(3) that there was insufficient evidence of premeditation and deliberation to support Petitioner's conviction;

(4) that there was insufficient evidence to support the lying-in-wait allegation;

(5) that Petitioner did not knowingly and intelligently waive his Miranda rights; and

(6) cumulative errors.

Because Petitioner's claims of insufficient evidence (claims 3 and 4) turn on the same law, the Court will address those claims together, and first. The Court then will address Petitioner's claim that the trial court erred in relaying instruction CALCRIM No. 3428 (claim 1); then will address Petitioner's claim that the trial court erred by giving CALCRIM Nos. 521 and 728 (claim 2); then will address Petitioner's *Miranda* claim (claim 5); and finally will address Petitioner's claim of cumulative error.

**1.    Insufficient Evidence Claims**

Petitioner claims that there was insufficient evidence of premeditation and deliberation to support his conviction for first degree murder, and that there was insufficient evidence of lying in wait to support the conclusion that he committed murder by lying in wait or to support the special circumstance enhancement for lying in wait.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the

evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id.* at 324.

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings . . . ." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam) (finding that the 3rd Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that the evidence was insufficient to support petitioner's conviction). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), *cert. denied*, 510 U.S. 843 (1993); *see, e.g., Coleman*, 566 U.S. at 656 ("the only question under *Jackson* is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality"). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338.

After AEDPA, a federal habeas court applies the standards of *Jackson* with an additional layer of deference. *See Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of *Jackson* to the case. *Coleman*, 566 U.S. at 651; *Juan H.,* 408 F.3d at 1275 (quoting 28 U.S.C. § 2254(d)). Thus, if the state court affirms a conviction under *Jackson*, the federal court must apply § 2254(d)(1) and decide whether the state court's application of *Jackson* was objectively unreasonable. *See McDaniel v.*

*Brown*, 558 U.S. 120, 132-33 (2010); *Sarausad v. Porter*, 479 F.3d 671, 677-78 (9th Cir. 2007). To grant relief, therefore, a federal habeas court must conclude that "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable." *Boyer v. Belleque*, 659 F.3d 957, 964-965 (9th Cir. 2011).

As discussed below, the Court cannot conclude that the state appellate court "was objectively unreasonable" in finding there was sufficient evidence of premeditation and deliberation to support Petitioner's conviction, and that there was sufficient evidence of lying in wait to support Petitioner's conviction and the lying-in-wait special circumstance.

### a. Premeditation and Deliberation

Petitioner argues that there was no evidence that he deliberated over his actions, and that instead the evidence introduced at trial tended only to show that enough time had passed to allow Petitioner to deliberate. *See* Pet. at 5, Pet. Ex. A at 20. Petitioner also argues that the evidence adduced at trial showed that Petitioner is incapable of deliberating. *See id*. The state appellate court rejected this argument, finding the evidence was sufficient to allow the jury to conclude that Petitioner was capable of deliberating, and to conclude that Petitioner acted with deliberation:

> "'In the context of first degree murder, premeditation means "'considered beforehand' " [citation] and deliberation means a "'careful weighing of considerations in forming a course of action ...'" [Citation.] "The process of premeditation and deliberation does not require any extended period of time."'" (*Salazar*, *supra*, 63 Cal.4th at p. 245.) "'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of premeditation and deliberation excludes from murder of the first degree those homicides ... which are the result of mere unconsidered or rash impulse hastily executed.' [Citation.]" (*Brooks*, *supra*, 3 Cal.5th at p. 58; see also *Casares*, *supra*, 62 Cal.4th at p. 824 [premeditation means "thought over in advance," while deliberation "refers to careful weighing of considerations in forming a course of action"].)

Our Supreme Court has described "three categories of evidence relevant to deciding whether to sustain a verdict of first degree murder based on premeditation and deliberation: (1) evidence of planning activity prior to the killing, (2) evidence of the defendant's prior relationship with the victim from which the jury could reasonably infer a motive to kill, and (3) evidence that the manner in which the defendant carried out the killing 'was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).'" (*Brooks*, *supra*, 3 Cal.5th at p. 59, citing *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) Our high court has cautioned, however, that "the *Anderson* factors are simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.'" (*Brooks*, *supra*, at p. 59.) "'In other words, the *Anderson* guidelines are descriptive, not normative.'" (*Casares*, *supra*, 62 Cal.4th at p. 824, quoting *People v. Koontz* (2002) 27 Cal.4th 1041, 1081.)

In this case, defendant argues, "the only rational conclusion" from the evidence is that he was unable to engage in premeditation or deliberation because he suffered from "grave mental deficits and defects" and post-traumatic stress disorder (PTSD), which caused him to react to stressful situations with rash and impulsive behavior. Defendant recalls the testimony of defense expert Edward Macias, a neuropsychologist who had examined defendant. Dr. Macias met with defendant four times, each for an hour and a half to two hours: the first was after defendant had been in jail for a year; the last, six months later. After administering a battery of neuropsychological tests and hearing defendant's account of his childhood, Dr. Macias concluded that defendant was "mildly mentally retarded" and had PTSD, with dissociative episodes. Defendant began drinking at seven years old, and his father was abusive and would strike defendant in the head. Because of his "brain impairment," defendant did not have the coping skills to handle stressful situations; if "something negative" happened in a relationship, or if he was publicly humiliated, he could be very depressed or very angry and lose control over what he was doing. His PTSD put him at risk for violent behavior and anger outbursts.

Dr. Macias acknowledged, however, that defendant showed no signs of delusional disorder or formal thought disorder. He further agreed that "killing someone very close to you who[m] you loved" could supply the traumatic event underlying a diagnosis of PTSD. Moreover, exacting revenge on someone by going to a bar to find the person, approaching the person in the bar, calling the person repeatedly, threatening the person, taking a cab to the person's house, hiding in a van to wait for the person

to arrive, approaching the person when she is enclosed in a car, pulling out a knife, stabbing her *twice*, running away, and hiding from the police were all "goal—directed" acts that could be those of an unimpaired subject as well as one prone to violent outbursts due to PTSD.

The defense also called Dr. Carolyn Murphy, a forensic psychologist. Dr. Murphy interviewed defendant through an interpreter about a month before her trial testimony. She observed a childlike, anxious, mildly depressed individual with "cognitive limitations," who scored in the "borderline range of intellectual functioning," but who could nonetheless pay rent and buy food and other things for himself. Dr. Murphy also reported symptoms of post—traumatic stress, which she suspected rose to the level of PTSD. Having read the transcript of the police interrogation of defendant, Dr. Murphy noted that defendant did not answer some questions directly or consistently; at times his answer was a "stream of [consciousness]." That indicated to Dr. Murphy that defendant could have been confused by those questions; she admitted, however, having not watched the video recording of the interview, that in those instances he might have been simply ignoring the question entirely.

In rebuttal to the defense experts' testimony, the prosecution presented Dr. Julian Filoteo, a clinical psychologist working as a university professor and staff psychologist at the Veterans Administration. Since 1999 he had seen two or three cases a week in which PTSD was a possible diagnosis; one in four of those with PTSD symptoms did not necessarily have the disorder. Dr. Filoteo agreed that even diminished control over one's behavior did not mean a particular individual could not control his or her behavior on any one occasion; psychologists needed to be "very careful not to overapply [the diagnostic] criteria" in order to make a diagnosis and to be "very, very careful" not to assume that a diagnosis would produce a specific behavioral consequence. Dr. Filoteo further agreed that a person with a mental illness "[a]bsolutely" can still function in society; even those with severe cognitive deficits may still know right from wrong, plan, and make decisions.

Having met with defendant for approximately seven hours and watched the video recording of defendant's confession to the police, Dr. Filoteo agreed that defendant had a "mild intellectual deficit," but he disagreed with the previous experts' diagnosis of PTSD. Defendant did have symptoms associated with PTSD— namely, nightmares of his father hurting him, sleep disturbances, and crying—but they did not rise to the level of the disorder. A person with PTSD typically has trouble going to work and engaging in social activities; and if PTSD is severe enough to cause a violent response to a rejection or embarrassing event, there should be a history of violence in the person's background. Likewise, a moderate to severe traumatic brain injury could

result in an increase in aggressiveness and violent behavior. Defendant did not report any history of violent social situations, trouble with coworkers, or a violent reaction to being escorted out of Mariano's. Although he had difficulties with memory, he did not necessarily have a brain injury—and if he did, it would be only a mild one; to be a moderate or severe brain injury, the person would have to have been unconscious for longer than 30 minutes, and defendant did not report that duration of unconsciousness in his history.

Clearly, the competing evaluations of defendant's cognitive and emotional functioning were a matter for the jury to weigh in its consideration of premeditation and deliberation. It could have inferred, based on the defense experts' testimony, that defendant's cognitive limitations made him likely to react rashly and impulsively in a stressful emotional situation. But it was not irrational for the jury instead to credit Dr. Filoteo's testimony and conclude that defendant was not so impaired as to be unable either to "th[ink] over in advance" his threat to kill Ceja or to engage in a "careful weighing of considerations" before carrying out his plan. (Cf. *Casares*, *supra*, 62 Cal.4th at p. 824; *Salazar*, *supra*, 63 Cal.4th at p. 245.) As noted earlier, the "preexisting thought and reflection" that constitute premeditation and deliberation need not be expressed as a cold, calculated judgment, but may be arrived at rapidly. (*People v. Stitely* (2005) 35 Cal.4th 514, 543.) In his police interview, defendant admitted that he was angry at being ejected from the bar and that he waited outside the bar near Ceja's car before taking a cab to her home. By this point, he told the detectives, he had already made up his mind to kill Ceja, and he threatened to kill her even before she left the club. He hid in Ceja's unlocked van for about 20 minutes until she arrived at the apartment complex where she lived. "To prove the killing was 'deliberate and premeditated,' it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act." (§ 189.) Taken together, the evidence before the jurors was more than sufficient to support their conclusion that the killing was carried out after premeditation and deliberation, notwithstanding the cognitive and emotional challenges defendant apparently faced.

*Anselmo*, 2017 WL 4546264, at *4-5.

The state appellate court's conclusion was not "objectively unreasonable."

First, as the state appellate court noted, the jury was presented with evidence from which it could have found that Petitioner was capable of deliberating. The jury was also presented with testimony from the prosecution's expert that Petitioner did not have PTSD at all. *See* Ans., Ex. B at 512:13-14 ("I disagree with the conclusion that Mr. Anselmo has

post-traumatic stress disorder."). Moreover, Petitioner's own expert testified that, even if petitioner had PTSD, persons with PTSD "can still make decisions, just like anyone," *id*. at 463:25-26, and that PTSD symptoms "wax and [] wane," *id*. at 463:3-5. Petitioner's expert was asked to evaluate Petitioner's actions on the night he killed Ms. Ceja, and stated that those actions were "consistent with unimpaired goal-directed or goal-oriented actions." *See id*. at 464:6-468:14. Petitioner himself told police that he "did this, this thing, in [his] right mind." Pet., Ex. A at 121:13. A jury may reject even uncontradicted expert testimony. *See People v. Wright*, 45 Cal. 3d 1126, 1142-43 (1988). Here, where the prosecution's expert contradicted Petitioner's expert on the question of whether Petitioner was capable of deliberating, and where Petitioner's own statements suggested he was capable of deliberating, a jury could find that Petitioner was capable of deliberating. The state appellate court was not objectively unreasonable in finding the jury's conclusion supported by sufficient evidence.

Second, the record provides ample evidence that Petitioner did, in fact, deliberate before killing Ms. Ceja. Petitioner told the police that, before taking a taxi to Ms. Ceja's house, Petitioner had already "made up [his] mind" . . . "[t]o kill" Ms. Ceja. Pet., Ex. A at 151:2-9 (stating this three times). Petitioner decided to kill Ms. Ceja "[b]ecause [he] was angry because they threw me out like a dog." *Id*. at 151:13-14. After making his decision, Petitioner was able to hail a taxi, ride in that taxi to Ms. Ceja's house, talk to the taxi driver, find a place to hide at Ms. Ceja's house, and hide for twenty minutes before stabbing Ms. Ceja twice in the chest. *Id*. at 151:5-154:17; *see also Anselmo*, 2017 WL 4546264, at *4 (summarizing Petitioner's actions). That Petitioner "made up his mind" to kill Ms. Ceja, and then took steps to carry out that decision, suggests that deliberation occurred.

The state appellate court was not objectively unreasonable in finding a jury could have concluded that Petitioner deliberated before killing Ms. Ceja. Accordingly, the state

appellate court's denial of this claim was not contrary to, or an unreasonable application

of, clearly established Supreme Court law.

### b.    Lying in Wait

Here, Petitioner argues there was insufficient evidence to support a finding of lying

in wait, because Petitioner "concealed neither his presence nor his purpose . . . [h]e had

threatened to kill the victim . . . and she could have driven away . . . ." Pet. at 7.  In state

court, Petitioner also argued that Ms. Ceja "failed to act prudently to protect herself," and

so was not "the unsuspecting victim of a surprise attack." Pet., Ex. A at 26.  The state

appellate court rejected this argument:

> Our Supreme Court has "differentiated between the lying-in-wait special circumstance and lying in wait as a theory of first degree murder on the bases that the special circumstance requires an intent to kill (unlike first degree murder by lying in wait, which requires only a wanton and reckless intent to inflict injury likely to cause death) and requires that the murder be committed 'while' lying in wait, that is, within a continuous flow of events after the concealment and watching and waiting end. [Citations.] Contrary to defendant's argument, the lying-in-wait special circumstance is not coextensive with either theory of first degree murder; it does not apply to all murders and is not constitutionally infirm." (*Casares*, *supra*, 62 Cal.4th at p. 849; accord, *People v. Delgado* (2017) 2 Cal.5th 544, 576 (*Delgado*).)
>
> The lying-in-wait special circumstance requires proof of " 'an intentional killing, committed under circumstances that included a physical concealment or concealment of purpose; a substantial period of watching and waiting for an opportune time to act; and, immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage.'" (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028 (*Becerrada*), quoting *People v. Stevens* (2007) 41 Cal.4th 182, 201 (*Stevens*); *People v. Clark* (2016) 63 Cal.4th 522, 628-629.) If "'"the evidence supports the special circumstance, it necessarily supports the theory of first degree murder."'" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1073 (*Mendoza*); *People v. Nelson* (2016) 1 Cal.5th 513, 550 (*Nelson*).) "'The concealment [that] is required, is that which puts the defendant in a position of advantage, from which the factfinder can infer that lying-in-wait was part of the defendant's plan to take the victim by surprise. [Citation.] It is sufficient that a defendant's true intent and purpose were concealed by his actions or conduct.'" (*People v. Morales* (1989) 48 Cal.3d 527, 555; *People v.*

United States District Court
Northern District of California

*Arellano* (2004) 125 Cal.App.4th 1088, 1096 (*Arellano*).) The element of concealment is satisfied by a showing that a defendant's true intent and purpose were concealed by his actions or conduct (e.g., hiding in a van). (*Mendoza*, *supra*, at p. 1073.)

The situation presented to the jury is reminiscent of that described in *People v. Superior Court* (*Lujan*) (1999) 73 Cal.App.4th 1123, 1128 (*Lujan*), where the reviewing court observed, "[I]n domestic violence cases, decisions to kill are often made quickly and often there are long-standing emotional issues involved. In such situations, murders are not always planned long in advance and executed pursuant to a preexisting plan. Nevertheless, where a defendant makes a decision to kill, conceals his purpose, watches and waits, and takes the victim by surprise, the murder was accomplished by means of lying in wait." (*Ibid.*; accord, *Arellano*, *supra*, 125 Cal.App.4th at p. 1095, fn. 4.)

That defendant had already threatened Ceja does not, as defendant argues, foreclose the finding that he concealed his purpose. Ceja had no way of knowing if, much less when, he would act on his threats. (See *People v. Johnson* (2016) 62 Cal.4th 600, 632 [while victim may have been concerned about his safety from the gang, he did not necessarily expect that he would be executed on that occasion]; see also *Arellano*, *supra*, 125 Cal.App.4th at p. 1095 [although the recipient of death threats might have expected an attack sometime in the future, she had no way of knowing when and where the attack would occur, and repeated threats of imminent death "tended to dilute the effect of those warnings"].)

Viewed in the light most favorable to the verdict, the record contains substantial evidence—evidence that is "reasonable, credible, and of solid value" (*People v. Johnson* (1980) 26 Cal.3d 557, 578; *Nelson*, *supra*, 1 Cal.5th at p. 550)—to support the finding that defendant intentionally killed Ceja by lying in wait. Defendant hid in Ceja's van for about 20 minutes, until she arrived at her apartment complex. He then did not wait for her to park in her assigned spot and get out of her car; he signaled her to stop and confronted her as she sat in the driver's seat with the engine running. Given these circumstances the jury could rationally find that after concealing himself for a substantial period of watching and waiting, defendant took Ceja by surprise and attacked her with his knife from a position of advantage. No due process violation occurred.

*Anselmo*, 2017 WL 4546264, at *6.

<u>First</u>, the state appellate court's finding regarding concealment of purpose appears

compelled by California law. *See Anselmo*, 2017 WL 4546264, at *6 (citing *People v.*

Case No. 18-01446 BLF (PR)
ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

*Johnson*, 62 Cal. 4th 600 (2016)). In *Johnson*, the defendant argued the victim "clearly knew defendant's real purpose" was to kill the victim, although defendant and victim ostensibly met for a drug purchase. 62 Cal. 4th at 632. The defendant had told the victim that the defendant would kill the victim, and the victim had made statements suggesting he feared for his safety. *See id*. Because the victim knew the danger that he was in, "[i]n defendant's view, the evidence did not show concealment of purpose but rather that Miller, a drug addict, made a bad choice to go with defendant to get drugs." *Id*. The California Supreme Court rejected this argument because the victim "did not necessarily expect that the execution would occur when he left the party with defendant to obtain drugs." *Id*. In other words, although the victim in *Johnson* had been threatened, and had expressed fear of harm, the jury could still "infer a surprise attack from a position of advantage" because the victim did not know he would be killed on that particular occasion. *See id*. at 632-33.

Here, Petitioner argued that he had repeatedly threatened Ceja with death on several occasions. Pet., Ex. A at 25-26. He also argued that Ceja "stopped [her] car because she saw petitioner and chose to speak with him." *Id*. at 25. Petitioner contended that under these facts, neither his purpose nor his person was concealed. However, as in *Johnson*, "[Ms.] Ceja had no way of knowing if, much less when, he would act on his threats." *Anselmo*, 2017 WL 4546264, at *6. The fact that threats had been made therefore does not mean Ms. Ceja knew Petitioner intended to kill her when she stopped her car. Likewise, that Ms. Ceja could see Petitioner in the moments before he stabbed her does not undercut the finding of surprise. In *Johnson*, the defendant escorted the victim into an alley before shooting him, *see Johnson*, 62 Cal. 4th at 633, and so the defendant in that case was at least as visible to his victim as Petitioner was to Ms. Ceja.

<u>Second</u>, the facts of this case suggest that Petitioner did, literally, conceal himself before attacking Ms. Ceja. As the state appellate court noted, Petitioner "hid in Ceja's van for about 20 minutes" and then "signaled her to stop and confronted her as she sat in the

driver's seat with the engine running." *Anselmo*, 2017 WL 4546264, at *6. The jury could find, based on Petitioner's decision to hide, that he had physically concealed himself in order to attack Ms. Ceja. Likewise, the jury could find, based on Petitioner's decision to attack Ms. Ceja in a parking lot, away from family and friends who might have come to her aid, that Petitioner intended to attack Ms. Ceja from a position of advantage.

Under California authority and according to the facts of this case, the state appellate court was not objectively unreasonable in finding a jury could have concluded that Petitioner lay in wait before killing Ms. Ceja. Accordingly, the state appellate court's denial of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law.

### 2.     Incorrectly Worded Instruction Claim: CALCRIM No. 3428

Petitioner contends that the trial court incorrectly relayed jury instruction CALCRIM No. 3428 because the instruction "as given, limited the use of evidence of mental impairment so as to make such evidence irrelevant to premeditation and deliberation." Pet. at 5. Specifically, Petitioner argues that by defining the required intent or mental state, the trial court prevented the jury from inferring that Petitioner's mental defects or disorder affected his ability to deliberate. Pet., Ex. A at 12.

The state appellate court found, first, that it was not reasonably likely that the jury understood the instruction as preventing it from considering Petitioner's mental defect or disorder, and second, that even if error had occurred such error was harmless:

> As read to the jury, CALCRIM No. 3428 stated: "You have heard evidence that the defendant may have suffered from a mental defect or disorder. You may consider this evidence only for the limited purpose of deciding whether at the time of the charged crime the defendant acted with the intent or mental state required for that crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically malice aforethought required for murder as charged in Count 1, and the intent to kill required for lying in wait as charged in Enhancement 1."

Defendant complains that this instruction failed to mention premeditation and deliberation as elements for which the jury could consider his mental impairment. He points out that once the trial court gives an instruction on a legal point, it has a duty to do so correctly. (Cf. *People v. Pearson* (2012) 53 Cal.4th 306, 325 [although a trial court has no sua sponte duty to give a pinpoint instruction on the relevance of evidence of voluntary intoxication, when it does choose to instruct, it must do so correctly].)

Defendant acknowledges that he did not request an addition to the instruction focusing the jury on premeditation and deliberation. "'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Landry* (2016) 2 Cal.5th 52, 99-100; *People v. Rojas* (2015) 237 Cal.App.4th 1298, 1304 (*Rojas*).) If a defendant could have asked for modification or clarification of the instruction he or she challenges on appeal, the forfeiture rule is "triggered" and the appellate court "review[s] the alleged instructional error only to determine if [the defendant's] substantial rights were affected ... i.e., whether the giving of [the instruction] resulted in a miscarriage of justice. [Citation.]" (*Rojas*, *supra*, at p. 1304; *People v. Townsel* (2016) 63 Cal.4th 25, 59-60 (*Townsel*); see § 1259 [notwithstanding lack of defense objection, appellate court may review any instruction given, refused, or modified "if the substantial rights of the defendant were affected thereby"].)

Defendant maintains that appellate review is not precluded here because his constitutional trial rights were affected. "'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.) Here, as defendant invokes his trial rights under the Fifth, Sixth, and Fourteenth Amendments to the federal constitution, we will review his claim of error notwithstanding his failure to request a modification. (See *Townsel*, *supra*, 63 Cal.4th at p. 60 [reviewing claim of constitutional violation despite the lack of objection to CALJIC No. 3.32].)

In this case, if his failure to request such clarifications is disregarded, and even if error occurred, it does not compel reversal. Our Supreme Court has repeatedly held that "'"incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" in [*People v.*] *Watson* [ (1956) 46 Cal.2d 818].' [Citations.] '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained

absent the error.' [Citation.] [¶] ... [¶] Further, the *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956; see *People v. Larsen* (2012) 205 Cal.App.4th 810, 829-830 [error in failing to give CALCRIM No. 3428 instruction nonprejudicial under *Watson*, where intent element was properly defined for the jury].)

Here, we cannot find a reasonable likelihood of a different outcome had defendant requested amplification of CALCRIM No. 3428 to encompass specifically premeditation and deliberation. "It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538-539.) Unquestionably the jurors were instructed on the intent or mental state required for first degree murder. The trial court told them that they could consider evidence that defendant had a "mental defect or disorder" when deciding whether, at the time of the charged crime, defendant acted "with the intent *or mental state* required for that crime." (Italics added.) We presume that the jurors associated the "intent or mental state" required for "the charged crime" with the mental elements of first degree murder, including premeditation and deliberation, which the court had already defined pursuant to CALCRIM No. 521. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852 [jurors are presumed able to "understand and correlate" instructions and to have followed the court's instructions].) There is no likelihood that a reasonable jury, considering CALCRIM No. 3428 in the context of the entire body of instructions on first degree murder, would have misunderstood the instruction as meaning it could not consider any mental impairment of defendant when determining whether the killing was by premeditation and deliberation.

Defendant's effort to distinguish *Townsel* is not persuasive. In that case the court instructed the jury with CALJIC No. 3.32 on how it could apply evidence of mental defect or disorder to the charges before it, which included murder, dissuading a witness, and witness-killing as a special circumstance. The defendant contended that the instruction given, directing the jurors to consider that evidence "solely" in determining whether the defendant "'actually formed the mental state which is an element of ... murder,'" (*Townsel*, *supra*, 63 Cal.4th at p. 59), limited the jury's consideration to malice aforethought, thus precluding its consideration of the evidence on the question of premeditation

and deliberation. The Supreme Court, noting its prior decision in *People v. Rogers* (2006) 39 Cal.4th 826, 878 (*Rogers*), rejected this position, although it did find error in the instruction's preclusion of the jury's consideration of the evidence for the dissuading charge and the witness—killing special circumstance. With respect to premeditation and deliberation, the *Townsel* court found the instruction sufficient, because once the jury found malice, it was directed to make the further finding of premeditation and deliberation, which undisputedly was a mental state. (*Townsel, supra*, at pp. 62-63.)

In *Rogers*, the defendant likewise argued that the instruction with CALJIC No. 3.32, which generally permitted the jury to consider a mental defect or disorder in determining whether the defendant actually formed the required mental states, was inadequate because it did not specifically identify premeditation and deliberation. The Supreme Court on that occasion held, "We previously have rejected claims that a trial court erroneously failed to identify premeditation and deliberation as a mental states to which evidence of mental disease or defect was relevant, in cases where the trial court either explained that premeditation and deliberation were mental states necessary for a conviction of first degree murder .... In [those] cases, in light of full instructions defining first degree murder including an explanation of premeditation and deliberation, we concluded 'a reasonable jury would have understood that the requisite mental states (as set forth in the definitions of the crimes) were the same "mental states" that could be considered in connection with the evidence of defendant's mental disease, defect, or disorder.' [Citation.]" (*Rogers, supra*, 39 Cal.4th at p. 881.) Even though premeditation and deliberation had not been specifically identified as mental states, "no reasonable juror would have assumed premeditation and deliberation were not 'mental states' as that term was used in the instruction relating defendant's evidence of mental disease or defect to the mental state necessary for the charged crimes." (*Id.* at p. 882, citing *People v. Castillo* (1997) 16 Cal.4th 1009, 1017.)

Here, too, the instructions, taken together, adequately informed the jury that any evidence of mental defect or disorder could be used "only for the limited purpose" of deciding whether, at the time of the killing, defendant actually formed "the intent or mental state" required for murder. The challenged portion of the instruction—that it was the People's burden to prove beyond a reasonable doubt that defendant acted "with the required intent or mental state, specifically malice aforethought required for murder"—merely repeated the admonition it had given regarding the burden of proof for each element of murder.

Even if error occurred, and even if there were not (as we concluded above) abundant evidence of premeditation and deliberation in the record, the jury also found that defendant killed Ceja by lying in wait. That finding alone designated the

crime as one of first degree murder. "'Lying in wait is the functional equivalent of proof of premeditation, deliberation, and intent to kill.' ... Once a sufficient period of watching and waiting is established, together with the other elements of lying-in-wait murder, no further evidence of premeditation and deliberation is required in order to convict the defendant of first degree murder. [Citations.]" (*People v. Sandoval* (2015) 62 Cal.4th 394, 416; see also *People v. Wright* (2015) 242 Cal.App.4th 1461, 1496 [showing of lying in wait makes unnecessary separate proof of premeditation and deliberation].) The court included "the intent to kill required for lying in wait" as part of its instruction on the use of defendant's asserted mental impairment. Thus, any misdirection of the jury as to premeditation and deliberation would not have altered the verdict.

*Anselmo*, 2017 WL 4546264, at *9-11.

First, it does not appear that the trial court's instruction was erroneous. As read, the jury instruction matches the text of CALCRIM No. 3428. *Compare Anselmo*, 2017 WL 4546264, at *9 (quoting the jury instruction) *with* CALCRIM No. 3428. Where the trial court was directed to "insert specific intent or mental state required, e.g., 'malice aforethought,'" CALCRIM No. 3428, the trial court inserted "malice aforethought required for murder as charged in Count 1, and the intent to kill required for lying in wait as charged in Enhancement 1," *Anselmo*, 2017 WL 4546264, at *9. To the extent Petitioner wanted the trial court to add language to CALCRIM No. 3428, which addition would state that the jury may consider his mental defect or disorder with respect to premeditation and deliberation in addition to the existing statement, Petitioner "did not request an addition to the instruction focusing the jury on premeditation and deliberation." *Id*.

Moreover, even if Petitioner had requested the addition to the jury instructions, and if the trial court had granted that request, the addition appears to be unnecessary in light of the instructions as a whole. The jury instructions on premeditation and deliberation refer to a required "inten[t] to kill." *See* Ans., Ex. B ("Transcript") at 640:28. As CALCRIM No. 3428 expressly states that the jury may consider evidence of mental defect or disorder to decide whether "the defendant acted with the intent . . . required for that crime," a

1    reasonable jury would logically have understood that it could consider Petitioner's claimed

2    defect or disorder when it considered his intent. The state appellate court found as much,

3    *see Anselmo*, 2017 WL 4546264, at *10, and that determination is binding on this court,

4    *see Menendez v. Terhune,* 422 F.3d 1012, 1029 (9th Cir.2005) (state court's determination

5    that, under state law, insufficient evidence warranted a defense instruction, was dispositive

6    of instructional error claim). Because there was no error, Petitioner has failed to show that

7    CALCRIM No. 3428 by itself so infected the entire trial that the resulting conviction

8    violates due process. *See Estelle v. McGuire,* 502 U.S. 62, 71-72 (1991) (stating the

9    standard); *see also Seagrave v. Gomez*, 974 F.2d 1343 (9th Cir. 1992) ("There is no

10   reasonable likelihood that the jury applied the instructions in a manner that violated the

11   Constitution. . . . First, the court's instruction was a correct statement of state law.")

12   (citation omitted); *see also Fernandez v. Beard*, No. C 13-04671 BLF (PR), 2015 WL

13   417181, at *7 (N.D. Cal. Jan. 27, 2015) (rejecting habeas claim predicated on a jury

14   instruction where, *inter alia*, the jury instruction was correct).

15        <u>Second</u>, even if the instruction had been erroneous, it is not reasonably likely that

16   the trial would have had a different outcome. Petitioner was "prosecuted for first degree

17   murder under two theories: One, the murder was willful, deliberate, and premeditated; and

18   two, the murder was committed by lying in wait." Tr. at 640:15-18. The jury expressly

19   found that Petitioner committed murder by lying in wait. *See id*. at 673:5-8 ("We the jury

20   further find the defendant, [F]lorencio Anselmo, in the commission of the crime in Count

21   1, did intentionally kill the victim by means of lying in wait in violation of Penal Code

22   Section 190.2(a)(15)."). As the state appellate court noted, this finding independently

23   supports Petitioner's conviction. *See Anselmo*, 2017 WL 4546264, at *11. Accordingly,

24   Petitioner would have been found guilty based on the lying-in-wait conclusion, regardless

25   of how the premeditation and deliberation instruction was worded.

26

27   Case No. 18-01446 BLF (PR)

28   ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

1    Because the jury instruction does not appear to have been erroneous, and because

2    any error would have been harmless, the state appellate court's denial of this claim was not

3    contrary to, or an unreasonable application of, clearly established Supreme Court law.

4        **3.    Instructional Error Claim: CALCRIM Nos. 521 and 728**

5        Petitioner contends that the trial court erred in giving jury instructions CALCRIM

6    Nos. 521 and 728 because those instructions "are inconsistent and misled the jury in how

7    they defined the element of substantial period of lying in wait." Pet. at 5. In state court,

8    Petitioner argued that the instruction caused jurors to believe that "the requisite mental

9    state for deliberate, premeditated murder follow[s] ineluctably from a substantial passage

10   of time." Pet., Ex. A at 15.

11       The state appellate court found the jury was not so misled:

> Defendant nevertheless takes issue with the instructions on lying
> in wait, particularly with respect to the amount of time necessary
> for the waiting to amount to premeditation and deliberation. In
> accordance with CALCRIM No. 521, the court stated, "The
> defendant is guilty of first degree murder if the People have
> proved that the defendant murdered while laying [*sic*] in wait, or
> immediately thereafter. The defendant murdered by laying [*sic*]
> in wait if, one, he concealed his purpose from the person killed,
> two, he waited and watched for an opportunity to act, and three,
> then from a position of advantage he intended to and did make a
> surprise attack on the person killed. *The lying in wait does not
> need to continue for any particular period of
> time, but* [*its*] *duration must be substantial enough to show a
> state of mind equivalent to deliberation or premeditation.*"
> (Italics added.)
>
> As a special circumstance, lying in wait was explained to the
> jury pursuant to CALCRIM No. 728, as follows: "A person
> commits a murder by means of lying in wait if, one, he or she
> concealed his or her purpose from the person killed, two, he or
> she waited and watched for an opportunity to act, three, then he
> or she made a surprise attack on the person killed from a position
> of advantage, and four, he or she intended to kill the person by
> taking the person by surprise. [¶] Lying in wait does not need to
> continue for any particular period of time, but [*its*] duration must
> be substantial and must show a state of mind equivalent to
> deliberation or premeditation." The court continued with the
> instruction by repeating its prior definitions of deliberation and
> premeditation. [FN 5]

[FN 5: Both as a theory of first degree murder and as part of the lying-in-wait special circumstance, premeditation was defined for the jury as "decid[ing] to kill before committing the act that caused death." Defendant was said to have acted deliberately "if he carefully weighed and [sic] considerations for and against his choice, and knowing the consequences, decided to kill."]

Defendant first contends that these instructions told the jury that a substantial period of time, which is not defined except by linking it with premeditation and deliberation, would lead the jury to assume that the duration of waiting "by itself shows a state of mind equivalent to deliberation or premeditation." In defendant's view, CALCRIM Nos. 521 and 728 are "misleading with respect to the theory of premeditated and deliberate murder, for they equate a particular mental state, which they fail to differentiate in any meaningful way from premeditation and deliberation, with the mere passage of time." In other words, "[t]he jury, so instructed, could only suppose that a substantial period of waiting for the victim to arrive by itself compels the conclusion that the defendant's mental state was that of premeditation and deliberation." "[B]y describing the requisite duration of the lying in wait as a duration substantial enough to show the equivalent of premeditation or deliberation, the instructions distort the concepts of premeditation and deliberation and prevent the jury from concluding that the defendant may not have premeditated or deliberated despite the passage of a substantial period of time waiting for the victim to arrive." According to defendant, this conflating of the two concepts violated the requirement that premeditation and deliberation be proved beyond a reasonable doubt, improperly favored the prosecution, and "nullified" his defense of mental impairment.

""""It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions." [Citation.]' [Citation.] ""A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]' [Citation.] '"[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."" [Citation.]'" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 905; see also *People v. Thomas* (2011) 52 Cal.4th 336, 356 ["A single jury instruction may not be judged in isolation, but must be viewed in the context of all instructions given"].)

We can find no reasonable likelihood that the jury understood the lying-in-wait instruction in the way asserted by defendant.

The court gave the jury thorough instructions on first degree murder as well as voluntary manslaughter. The instructions included the specific admonition that "[t]he length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances." The jurors were also cautioned that the test of premeditation and deliberation is "the extent of the reflection, not the length of time." Connecting the duration of lying in wait to premeditation and deliberation could not have negated the full and specific instructions on premeditation and deliberation, particularly since the court told the jury that each theory of first degree murder has different requirements. Reviewing the instructions as a whole, as we must, the reference to the duration of lying in wait in CALCRIM Nos. 521 and 728 could not reasonably have misled the jury into discarding the entire explanation of premeditation and deliberation in the remaining instructions.

Defendant next looks to the lying-in-wait instruction, which he perceives as internally inconsistent to the detriment of his due process rights. Defendant points to the requirement of a "substantial" period of waiting and watching for an opportunity to act, part of both the theory of first degree murder and the special circumstance. According to defendant, CALCRIM Nos. 521 and 728 both contain an "internal contradiction within the instruction requiring a 'substantial' period of time in concealed waiting for the opportunity to act and the instruction's direction to find such substantial time provided there was time enough for the development of a mental state which 'can be reached quickly' and which is not to be tested by the length of time available for developing it ... The internal inconsistency of the instruction precludes any confidence that the jury found the element of a 'substantial' duration of the concealment of purpose." Instead, defendant believes, the jurors would "necessarily" be led to infer "that a 'substantial' period of time is the time it would take for a person to make 'a cold, calculated decision to kill,' which, the instruction explains, can be reached quickly, so that the jury would understand that the concealment of purpose may begin and end 'quickly.'"

We are unconvinced by defendant's reasoning. He concedes that our Supreme Court has repeatedly approved of the description of "substantial period" in the lying-in-wait instructions without finding it necessary to impose a minimum duration on the jury's findings. On the contrary, " '[a]lthough we have held the period of watchful waiting must be "substantial" [citation], we have never placed a fixed time limit on this requirement. Indeed, the opposite is true, for we have previously explained that "[t]he precise period of time is also not critical." [Citation.] ... [A] few minutes can suffice.'" (*People v. Russell* (2010) 50 Cal.4th 1228, 1244, quoting *People v. Moon* (2005) 37 Cal.4th 1,

23; *Mendoza, supra,* 52 Cal.4th at p. 1073; *Nelson, supra,* 1 Cal.5th at p. 550.) The court has likewise rejected claims that the description of the time element is contradictory and confusing. (See *People v. Bonilla* (2007) 41 Cal.4th 313, 332-333 [instruction on lying-in-wait special circumstance is neither contradictory nor unconstitutionally imprecise]; *Stevens, supra,* 41 Cal.4th at pp. 203-2004 [special circumstance not confusing or constitutionally flawed, as "any overlap between the premeditation element of first degree murder and the durational element of the lying in wait special circumstance does not undermine the narrowing function of the special circumstance"].) In this case, moreover, there is no likelihood that the jury found a concealment of purpose that began and ended quickly, because defendant concealed himself in Ceja's van for 20 minutes, which unquestionably was a substantial period. We thus see no reasonable probability that the jury, having been instructed correctly with all of the elements of both lying in wait and premeditation and deliberation, reached an erroneous verdict in finding defendant guilty of first degree murder.

*Anselmo,* 2017 WL 4546264, at *11-13.

The state appellate court was not unreasonable in concluding the jury would not be misled by CALCRIM Nos. 521 and 728. Far from leading the jury to believe that "mental state . . . follows ineluctably from a substantial passage of time," both instructions at issue repeatedly state that no "particular period of time" is necessary. *See id*. at 11. In addition, the jury was expressly told that the length of Petitioner's thought process "'[did] not alone determine whether the killing is deliberate and premeditated'" because "'[t]he amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances.'" *Anselmo,* 2017 WL 4546264, at *12 (citation omitted). Given the repeated admonitions that the length of time is not determinative, a reasonable juror is not likely to have assumed that a substantial length of time automatically gives rise to the required mental state.

Petitioner raised a second argument in state court: that CALCRIM Nos. 521 and 728 are internally inconsistent because they both require a "substantial" period of time, but CALCRIM No. 521 also states that "a cold, calculated decision to kill can be reached quickly." *See* CALCRIM No. 521. The state appellate court found that these jury

1    instructions correctly stated California law, *see Anselmo*, 2017 WL 4546264, at \*13, and

2    that determination is binding on this court, *see Menendez*, 422 F.3d at 1029 (state court's

3    determination that, under state law, insufficient evidence warranted a defense instruction,

4    was dispositive of instructional error claim). Moreover, even if the instructions were

5    incorrect, any error was harmless: "there is no likelihood that the jury found a concealment

6    of purpose that began and ended quickly, because defendant concealed himself in Ceja's

7    van for 20 minutes, which unquestionably was a substantial period." *Anselmo*, 2017 WL

8    4546264, at \*13.

9         Because the jury instructions do not appear to have been erroneous, and because

10   any error would have been harmless, the state appellate court's denial of this claim was not

11   contrary to, or an unreasonable application of, clearly established Supreme Court law.

12        **4.    *Miranda* Claim**

13        Petitioner argues that the admission of his confession to police – that Petitioner

14   killed Ms. Ceja, when, how, and why – violated Petitioner's Fifth Sixth, and Fourteenth

15   Amendment rights. *See* Pet. at 7. Specifically, Petitioner argues that his "limited

16   intellectual and cognitive functioning, inexperience with the criminal justice system, and

17   post-traumatic-stress symptoms rendered him incapable of understanding or waiving his

18   *Miranda* rights." *Id*.

19        The state appellate court found that Petitioner's Miranda waiver was knowing and

20   intelligent:

21            Before trial defendant moved to exclude the statements he made
             to the police detectives during his 46-minute initial interview in
22            the evening of July 5, 2014. Defense counsel argued that
             defendant's "mild mental retardation, cognitive deficits, abusive
23            background[,] diagnosis of Post—traumatic Stress Disorder, and
             intoxication raises [*sic*] serious questions regarding his ability to
24            understand and appreciate the implications of waiving
             his *Miranda* rights. Moreover, the incorrect, trivialized Miranda
25            warning, the absence of an express waiver, no prior experience
             with the legal system and the ... neuropsychological findings [by
26            Dr. Macias] all imply that Anselmo did not knowingly and
             intelligently waive his Miranda rights."

27   Case No. 18-01446 BLF (PR)

28   ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

When arrested at 4:25 p.m., defendant was intoxicated, so detectives waited five hours before beginning the first interview. Detective Roman started by saying, "Ok. Let me read you some, some things before asking you some questions. ..." He then read defendant his *Miranda* rights in Spanish and asked defendant, "Do you understand the rights that I have explained to you?" Defendant answered, "Correct." Detective Roman asked, "Yes?" Defendant nodded yes, at which point the detective asked defendant a series of questions unrelated to the crime in order to determine that defendant was able to respond appropriately. Questioning about the night before followed.

In the motion to exclude, defense counsel argued that the detective trivialized the required warnings in his introductory comment, "Let me read you some, some things ...." Counsel pointed out that defendant never expressly waived his rights. No knowing and intelligent waiver could have been implied, his attorney added, because he had no prior experience with the United States legal system, was of low-functioning intelligence, exhibited symptoms of PTSD, and was intoxicated. Testifying at the motion hearing, however, Detective Roman stated that he had no trouble communicating with defendant, who responded appropriately and understandably to the questions asked of him. Although defendant appeared to have a problem with numbers, he did not seem to have trouble recalling the details of events. He "could have been" under the influence of alcohol, but by the time of the interview, five hours after his arrest, he was not so affected that he could not understand what was said to him.

The trial court, having reviewed both the video and the transcript, found that defendant had made an implied waiver of his rights, as he "actually seemed fine with talking [and] didn't seem reluctant to answer the questions." Nor did defendant appear to be under the influence: his speech was not slurred, his answers seemed to be responsive, and his behavior on the video recording "seemed normal to the [c]ourt." The court further rejected the argument that defendant's cognitive disability vitiated his waiver, as he "still fully understood what he was saying [and] understood his rights."

On appeal, defendant renews his claim that his "limited intellectual and cognitive functioning, his inexperience with the criminal justice system, and his [PTSD] symptoms rendered him incapable of understanding or waiving his *Miranda* rights." He further points out that he lacked a formal education and was illiterate. The introduction to the warnings, he repeats, could have appeared to defendant as a "mere preamble to the questions" that would follow, and the warnings themselves "were read quickly, with very brief, irregular pauses." Finally, defendant calls attention to his "distressed and confused state" during questioning, with the video showing him "hanging his head, crying, and displaying confusion and uncertainty even when asked simple questions such as his date of birth and age."

At various points in the interview, defendant gave nonresponsive answers, had trouble recognizing Ceja's apartment from a photo, called Ceja "Cejas," and forgot the name of one of Ceja's children despite having lived with them.

Defendant acknowledges that the detectives were not required to obtain an express waiver of his rights; "[r]ather, a valid waiver of *Miranda* rights may, as here, be inferred from the defendant's words and actions. [Citation.]" "In general, if a custodial suspect, having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them." (*People v. Cunningham* (2015) 61 Cal.4th 609, 642; see *North Carolina v. Butler* (1979) 441 U.S. 369, 374-375 [in particular circumstances of the case, including background and conduct of the accused, waiver may be inferred from suspect's actions and words during interrogation].) "In determining the validity of a *Miranda* waiver, courts look to whether it was free from coercion or deception, and whether it was ""made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.""" (*People v. Davis* (2009) 46 Cal.4th 539, 585-586 (*Davis*), quoting *People v. Whitson* (1998) 17 Cal.4th 229, 247 (*Whitson*).)

Our review of this issue is well defined: We accept the trial court's determination of disputed facts and inferences, including the credibility of witnesses, if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda.* (*Davis*, *supra*, 46 Cal.4th at p. 586; *Whitson*, *supra*, 17 Cal.4th at p. 248; *People v. Sauceda—Contreras* (2012) 55 Cal.4th 203, 217.) In making this independent determination, however, we "" 'give great weight to the considered conclusions' of a lower court that has previously reviewed the same evidence." [Citations.]'" (*Whitson*, *supra*, at p. 248.) Here, the trial court's finding that defendant understood and impliedly waived the rights he was giving up was supported by the testimony of Detective Roman and the court's own inferences from defendant's verbal and nonverbal responses during the video-recorded interview.

We are unconvinced by defendant's assertion that the admonition was "trivialized" by the detective's introductory "Let me read you some, some things before asking you some questions." "'Reviewing courts ... need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably "conve[y] to [a suspect] his rights as required by *Miranda*."' [Citation.]" (*People v. Kelly* (1990) 51 Cal.3d 931, 948-949.) This is not a situation comparable to those in which interrogator misleads the suspect into devaluing his or her rights by "minimizing their legal significance," such as by representing the warnings as a mere technicality (cf. *People v.*

*Musselwhite* (1998) 17 Cal.4th 1216, 1237); at most the prefatory statement here focused defendant's attention on the significance of the questions the detective was about to ask. Nor can we reject the trial court's factual finding that defendant was not so impaired that he was unable to understand the importance of his rights, the nature of the questioning, and the implications of his answers. Having independently reviewed the interrogation in light of defendant's background and his emotional expression and conduct during the interview, [FN 4] and according the trial court's conclusions the "great weight" they deserve (*Whitson, supra,* 17 Cal.4th at p. 248), we find no error in its denial of the motion to exclude defendant's post-arrest answers to the detective's questions. Defendant understood the *Miranda* warnings he was given, validly waived his Fifth Amendment right to remain silent and to an attorney, and voluntarily admitted planning to kill Ceja and carrying out that plan as she sat in her car.

> [FN 4: Exhibit 1A, the video recording of the interview, was provided to this court. Our impression of defendant's evident emotional state and cognitive awareness lends support to the trial court's view that defendant was sufficiently alert and in control of the information he was conveying to the detectives. His crying episodes were frequent but brief, most often triggered by his recollection of being "dragged" out of Mariano's "by force," "like dogs." His demeanor was relatively calm as he described the knife and how he stabbed Ceja and ran away. Unequivocally he told the detectives, "I don't deny anything," and he offered to show them where he had hidden the knife.

Even if we found error, we would reject defendant's assertion that the court's admission of the challenged statements was prejudicial. Reversal of a ruling admitting statements made without a valid *Miranda* waiver is not required if the error was harmless beyond a reasonable doubt. (*People v. Thomas* (2011) 51 Cal.4th 449, 498; *People v. Cunningham* (2001) 25 Cal.4th 926, 994; see *People v. Elizalde* (2015) 61 Cal.4th 523, 542 [error in admitting defendant's answers to questions about gang affiliation without *Miranda* admonitions harmless where that fact was "amply established by independent and uncontradicted evidence"].) Defendant suggests that without the confession, "the evidence left room for reasonable doubt." He concedes that his prior threats, along with Y.'s testimony that she saw defendant next to her mother's car, "would arouse a strong suspicion that he was the stabber." Those threats, documented in the voice mail messages Ceja received that night, provided ample circumstantial evidence of defendant's guilt, particularly when viewed in light of the history of his relationship with Ceja, the arguments they had had over her social activities without

him, the recorded events at Mariano's, and defendant's agitated response to being rejected by Ceja and escorted out of the bar. Most telling is Y.'s eyewitness account of hearing her mother scream and running outside to see defendant leaning inside the car with the door open and Ceja in the driver's seat with two fatal stab wounds in her chest. While defendant points out that the jury "might have doubted [Y.'s] testimony," he offers no reason to conclude that Y. was not a credible witness whose testimony was demonstrably false or inherently improbable. (See *People v. Brown* (2014) 59 Cal.4th 86, 105 [credibility of in-court witness should be left for jury's resolution absent "demonstrable falsity or physical impossibility"]; *People v. Elliott* (2012) 53 Cal.4th 535, 585 ["Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction"]. Reversal is not required based on defendant's disclosures to the detectives during questioning.

*Anselmo*, 2017 WL 4546264, at \*7-9.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that a person subjected to custodial interrogation must be advised that "he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *Miranda*, 384 U.S. at 444. Once properly advised of his rights, an accused may waive them voluntarily, knowingly, and intelligently. *See id*.

A valid waiver of *Miranda* rights depends upon the totality of the circumstances. *See United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986). "The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). The waiver may be implied by conduct,[1] and need not be explicit or written. *Id.* at 383.

---

[1] "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis*, 560 U.S. at 384. The law presumes that individuals who fully understand their rights and act in a manner inconsistent with them have made "a deliberate choice to relinquish the protection those rights afford." *Id.* at 385;

Here, the parties do not dispute that *Miranda* was triggered by the custodial interrogation of Petitioner. *See generally*, Pet. & Ans. Instead, the parties dispute the validity of Petitioner's *Miranda* waiver. *See* Pet. at 7; Ans. at 17-23.

Petitioner's <u>first</u> argument attacking the *Miranda* waiver is that Petitioner was "incapable of understanding or waiving his *Miranda* rights" given Petitioner's "limited intellectual and cognitive functioning, inexperience with the criminal justice system, and post-traumatic-stress symptoms." Pet. at 7. However, considering the "totality of the circumstances," Petitioner's *Miranda* waiver was valid.

Although Respondent appears to concede that Petitioner has "diminished mental capacity," Ans. at 21, that, by itself, is insufficient to show that his *Miranda* waiver was invalid. Instead, in evaluating the totality of the circumstances, courts are directed to consider "[r]elevant circumstances" such as "a suspect's age, education, intelligence, physical health, and prior experience with the criminal system; the length, location, and conditions of detention; the length and nature of questioning; and the use by law enforcement of any threats, punishments, or inducements." *Bradford v. Davis*, 923 F.3d 599, 616 (9th Cir. 2019).

Petitioner's personal characteristics are neutral on this point. Although Petitioner suffers from diminished mental capacity and is uneducated, *see id.*, he was 37 years old at the time of the interrogation, *see* Ans., Ex. A at 110:15; his own expert testified that Petitioner had "basic life skills" and could "functionally pay rent, buy food, buy things for himself," Ans. Ex. B at 483:21-25; and he had some experience with the criminal system, having been arrested in Mexico on a prior occasion, *see* Ans. Ex. A at 137:23-24, 159:2-6. It thus does not appear from the record that the state appellate court was unreasonable in concluding that Petitioner was capable of understanding his *Miranda* rights.

---

*see, e.g., United States v. Younger*, 398 F.3d 1179, 1186 (9th Cir. 2005) (finding implied waiver based on evidence that after defendant was advised, but before questioning, he made a spontaneous statement and responded to questions without reference to counsel).

The nature of Petitioner's detention before questioning, and the questioning itself, suggest that the state appellate court was correct in upholding the *Miranda* waiver.

Although Petitioner was drunk when he was arrested, officers waited "for about five hours until he appeared sober and alert" before questioning him. *Anselmo*, 2017 WL 4546264, at *2. There is no indication that Petitioner was mistreated or intimidated during this time. *See generally id.*; *see also* Pet. & Exs. (not arguing that Petitioner was mistreated during this five-hour period). Before officers began to question Petitioner, Petitioner was given a *Miranda* warning, asked twice if he understood his rights, and answered in the affirmative each time. *See* Ans., Ex. A at 106:21-24. The officers' questioning was not aggressive, and the officers do not appear to have intimidated Petitioner into answering questions. *See id.* at 106:3-160:11. In fact, Petitioner offered to tell the officers how he had killed Ms. Ceja even before the officers asked a single question about the killing:

> [Petitioner]: What I did ... let's see, ask me more questions and I'm going to tell you how I did it.
> [Officer]: What did you do?
> [Petitioner]: I'm going to tell you.
> [Officer]: Please.
> [Petitioner]: But, no, but ... like you're asking, I'm going to tell you.
> [Officer]: Ok. Why did you start drinking?
> [Petitioner]: Out of anger. Out of anger.
> [Officer]: Why?
> [Petitioner]: Out of anger that she didn't want to be with me ... and that's why I did ...

*Id.* at 111:22-112:8.

Moreover, the record supports the state appellate court's conclusion that Petitioner "'still fully understood what he was saying.'" *Anselmo*, 2017 WL 4546264, at *7. Petitioner was able to take the officers through the events of the evening on which he killed Ms. Ceja, in an organized and chronological manner. *See id.* at 113:26-114:12 (starting his story "at the dance first"), 116:12-129:25 (describing events from the dance

through the stabbing of Ms. Ceja, and Petitioner's flight from the scene). He was able repeatedly to correct officers when they mistook the night that the stabbing had occurred, and to tell them that it happened on Friday night. *See id*. at 114:13-15, 116:27-117:3 120:16-19. Petitioner also was able to answer factual questions such as the name of the street on which he was living, and to correct the officer when he believed the officer had mispronounced that street's name. *See id*. at 106:24-107:2. As the state appellate court found, the fact that Petitioner had the presence of mind to organize his thoughts sufficiently to relate events a chronological fashion, and to notice and correct officers' mistakes, suggests that Petitioner was capable of understanding his rights when they were read to him. *See Anselmo*, 2017 WL 4546264, at *7 ("defendant . . . did not seem to have trouble recalling the details of events"). Thus, considering the totality of the circumstances, it does not appear the state appellate court was unreasonable in upholding Petitioner's *Miranda* waiver.

Petitioner's <u>second</u> argument, that the *Miranda* "warnings were read in a way that would likely mislead" him, Pet. at 7, also fails. Petitioner does not argue that he was actually misled by the warnings, and the officers' statements do not appear calculated to mislead. Although the officer stated "[l]et me read you some, some thing before asking you some questions," Ans., Ex. A at 106:6-7, the state appellate court found that the officer did not "devalue[e]" or "minimize[e] the[] legal significance" of Petitioner's rights, *see Anselmo*, 2017 WL 4546264, at *8. In fact, the officer expressly used the word "right" or "rights" three times, *see id*. at 106:8-19, and twice asked Petitioner if Petitioner understood his rights, *see id*. at 106:21-24. Moreover, the rights as read "touched all of the bases required by *Miranda*." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (listing these bases). There is simply no indication in the record that Petitioner was misled by the reading of his rights.

Finally, on federal habeas review, reversal is only warranted if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks and citation omitted); *see also Fry v. Pliler*, 551 U.S. 112, 120–22 (2007) (*Brecht* harmless error standard applies on collateral review by federal habeas court where state appellate court failed to recognize the error and did not review it for harmlessness). The Court finds that any *Miranda* violation in this case did not have a substantial and injurious effect or influence on the jury's verdict because the prosecutor presented weighty evidence of Petitioner's guilt apart from Petitioner's confession. The very evening she was killed, Petitioner had repeatedly told Ms. Ceja that he would kill her. *See Anselmo*, 2017 WL 4546264, at *9. These threats were "documented in the voice mail messages" Petitioner left for Ms. Ceja. *Id*. The same evening Petitioner threatened to kill Ms. Ceja, Ms. Ceja's daughter, Y., heard her mother scream, ran outside, and saw Petitioner "leaning inside the car with the door open and Ceja in the driver's seat with two fatal stab wounds in her chest." *Id*. "When [Petitioner] saw Y., he tried to close the door." *Id*. at *2. He then ran away. *Id*.

The voice mail messages are overwhelming evidence of Petitioner's intent to murder Ms. Ceja. In addition, circumstantial evidence in the form of Y.'s eyewitness account strongly suggests Petitioner actually murdered Ms. Ceja. The evidence of Petitioner's guilt, outside of the confession, was weighty and supports the Court's finding of harmless error. *See Brecht*, 507 U.S. at 639 (trial error was harmless where "the State's evidence of guilt was, if not overwhelming, certainly weighty"). Petitioner is not entitled to habeas relief on this claim.

### 5. Cumulative Error Claim

Petitioner argues the cumulative effect of the alleged constitutional errors violated his right to a fair trial. Pet. at 7. In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a

defendant so much that his conviction must be overturned. *Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003). However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011). Similarly, there can be no cumulative error if there has not been more than one error. *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012).

Here, there were no constitutional errors and, therefore, nothing can accumulate to the level of a constitutional violation.

## IV. CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**. *See* Rule 11(a) of the Rules Governing Section 2254 Cases. Petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

**IT IS SO ORDERED**.

Dated: ___October 10, 2019___

BETH LABSON FREEMAN
United States District Judge